**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

SANDRA WILSON,

                                    Plaintiff,

          vs.                                                    1:16-cv-1486
                                                                 (MAD/DJS)

NATIONAL GRID USA SERVICE COMPANY, INC.
and NIAGARA MOHAWK POWER CORP.,

                                    Defendants.

_____

APPEARANCES:                          OF COUNSEL:

SMITH HOKE, PLLC                      JOHN J. HOKE, ESQ.
16 Wade Road                          MEREDITH A. MORIARTY, ESQ.
Latham, New York 12110
Attorneys for Plaintiff

BOND, SCHOENECK & KING                ROBERT A. LABERGE, ESQ.
One Lincoln Center                    KSENIYA PREMO, ESQ.
Syracuse, New York 13202
Attorneys for Defendants

Mae A. D'Agostino, U.S. District Judge:

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

          Plaintiff commenced this action on December 13, 2016 against National Grid USA

Service Company and Niagara Mohawk Power Corporation (together "Defendants"), alleging

unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964,

Section 1981 of the Civil Rights Act, and the New York State Human Rights Law.  _See_ Dkt. No.

1 at ¶ 5.  Plaintiff claims that she has "regularly faced discrimination and a hostile work

environment because of [her] race, color, and gender" and that she has been disproportionally

disciplined as compared to similarly situated "male-Caucasian employees."  _See_ Dkt. No. 32 at ¶

9.  Additionally, Plaintiff claims that Defendants retaliated against her after she filed a complaint with the New York State Division of Human Rights ("NYSDHR").  *See id.*

Presently before the Court is Defendants' Motion for Summary Judgment.  For the following reasons, that motion is granted.

## II. BACKGROUND

**A.    Facts**[1]

### *1. Background*

This case involves many employees at Defendants' gas operations department in Schenectady, New York.  Gary Stevens, Tony Cianfarani, Pat White, Tony Savona, and Stacy Piel were all Plaintiff's supervisors in Schenectady at various times.  *See id.* at ¶¶ 12, 22, 26; Dkt. No. 26-13 at ¶ 9.  At all relevant times, Scott Ackermann was the Lead Supervisor or Manager of Gas Operations for the Eastern Division, Kevin Krogh was the Gas Operations Manager for the Eastern Division, and Bryan Buck was Director of Gas Operations for the Eastern Division.  *See* Dkt. No. 26-3 at ¶ 1; Dkt. No. 26-1 at ¶ 1; Dkt. No. 26-14 at ¶ 1.

Plaintiff has worked at Niagra Mohawk Power Company since February 19, 1990, and has been continuously employed in the gas operations department in Schenectady since 2000.  *See* Dkt. No. 31-3 at 7:18-20, 16:16-19.  Within the gas operations department, Plaintiff progressed through a series of gas mechanic positions, culminating in her promotion to Chief Gas Mechanic

---

[1] Pursuant to Rule 56(e), affidavits submitted in support of or in opposition to the summary judgment motion must "be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see, e.g., Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) (citations omitted).  A conclusory statement or hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial.  *See Patterson*, 375 F.3d at 219 (2d Cir. 2004).  Several statements in Plaintiff's supporting papers do not meet this standard, so they do not create a genuine issue of fact.  *See, e.g.*, Dkt. No. 32 at ¶¶ 28, 29, 36; Dkt. No. 33 at ¶¶ 9-11, 13.

in January 2014.  *See* Dkt. No. 30 at 1-2.  As Chief Gas Mechanic, Plaintiff was expected to comply with all company safety policies and federal regulations applicable to her work.  *See* Dkt. No. 32-1 at 18.  Additionally, Plaintiff had quasi-supervisory responsibilities, and was responsible for ensuring that her crews complied with these rules and performed their tasks in a safe and reliable manner.  *See* Dkt. No. 26-1 at ¶ 9; Dkt. No. 32-1 at 18.  Plaintiff received training about all of her duties, company policies, and relevant federal regulations.  *See* Dkt. No. 32-1 at 17.

### *2. Offensive Comments & Conduct*

Plaintiff testified that she has never actually heard any employee at the company make racially charged or inappropriate comments in her presence.  *See* Dkt. No. 31-4 at 113:9-14. Furthermore, Ms. Piel and Mr. Ackermann have both stated that they have never heard or witnessed any gender or race based comments or conduct directed towards Plaintiff or about Plaintiff.  *See* Dkt. No. 26-13 at ¶ 13-14; Dkt. No. 26-3 at ¶ 22.  Nevertheless, Plaintiff makes numerous broad, conclusory allegations about offensive comments in the Complaint and her Affidavit in Support of the Opposition to Summary Judgment ("Plaintiff's Affidavit").  *See, e.g.,* Dkt. No. 32 at ¶¶ 27-29 ("Mr. White and others used gender-based and racially-based derogatory and offensive comments directed towards me and others in the Schenectady barn"); *see also* Dkt. No. 1 at ¶¶ 14, 16, 17, 19, 21.

The record does include a handful of specific instances of offensive conduct and comments.  Plaintiff testified that she saw a sexualized cartoon drawing of herself "with large lips, large chest, and a large derriere," which she may or may not have reported to a supervisor.[2] *See* Dkt. No. 32 at ¶ 15; Dkt. No. 31-4 at 105:2-5.  Additionally, Plaintiff heard people

---

[2] At her deposition, Plaintiff could not recall if she reported this cartoon; in Plaintiff's Affirmation, she stated she reported it because she "understood it to portray exaggerated racial stereotypes."  *See* Dkt. No. 31-4 at 116:2-4; Dkt. No. 32 at ¶ 15.

referencing her appearance while discussing a cartoon drawing of "Aunt Jemima." *See* Dkt. No. 32 at ¶ 16; Dkt. No. 31-4 at 103:5-10. Plaintiff never saw the Aunt Jemima cartoon, and could not remember if she ever reported it. *See* Dkt. No. 31-4 at 103:9-10, 116:5-10.

In 2012, Plaintiff's supervisors, Mr. Cianfarani and Mr. Savona, disciplined her for being late to work by requiring her to report upstairs and "raise [her] hand to be acknowledged that [she] was on time" every day for over three months. *See* Dkt. No. 31-3 at 45:10-18. Plaintiff was not suspended and did not lose any pay as a result of her tardiness. *Id.* at 46:21-47:6. At her deposition, Plaintiff admitted that she had been late a number of times before having to report in this manner. *See* Dkt. No. 31-4 at 101:14-19. Still, Plaintiff believes that this punishment was unfair because no other employees were subject to this sort of discipline. *See* Dkt. No. 32 at ¶ 14.

Plaintiff alleges that she was harassed by her supervisor Mr. White. Plaintiff recalls hearing Mr. White call her incompetent and stupid, and tell people that she did not know how to do her job. *See* Dkt. No. 31-4 at 62:4-10. Plaintiff also claims that Mr. Stevens told Mr. Ackermann that Mr. White told people that Plaintiff was a "nanny" and that all she did was "bitch."[3] *Id.* at 61:9-13. Finally, Plaintiff claims that Mr. White said that it was "his goal to 'get rid . . . . [of] all the niggers in Schenectady'" and told two African American employees that wearing white suits to work "is the closest [they] will be to being white." *See* Dkt. No. 1 at ¶ 25; Dkt. No. 32 at ¶¶ 27-29 (alterations in original). Yet, Plaintiff admits that she never actually heard Mr. White say those things and that she does not know who informed her of these statements. *See* Dkt. No. 31-4 at 113:2-6; *but see* Dkt. No. 32 at ¶¶ 28-29.

---

[3] This statement is double hearsay. *See* Dkt. No. 35 at 10. Additionally, Stevens testified that he could not recall White ever calling Plaintiff incompetent, he never heard White speak improperly to Plaintiff, and could not recall if another person had told him that he had done so. *See* Dkt. No. 31-2 at 51:22-52:17.

4

At some point, Plaintiff reported Mr. Cianfarani to the Ethics Department because he would yell at Plaintiff for driving the crew truck. *See* Dkt. No. 31-4 at 22:18-20. In one instance, Mr. Cianfarani ". . . ran over to the truck, snatched the door open, and stuck his finger and was jabbing his hand at me screaming about driving the crew truck." *Id.* at 22:23-23:3. Plaintiff testified that Mr. Cianfarani did not want her to drive the truck because he thought it was the foreman's responsibility to drive it. *Id.* at 25:7-12. Nevertheless, she claims that she was the only one in Schenectady who was not allowed to drive the truck. *See* Dkt. No. 32 at ¶ 12.

At some point prior to January 2014, a coworker named Mike Cordi said to Plaintiff "[w]hy was I here; why didn't I go back to where I came from; nobody wants you here; why don't you go kill yourself." *See* Dkt. No. 31-4 at 106:21-24, 110:5-9. Additionally, Mr. Cordi and Plaintiff had an argument where Mr. Cordi "charged across the garage floor as though he was going to hit me" and the union steward had to step in. *Id.* at 108:18-23. After that, the steward informed Defendants that Plaintiff and Mr. Cordi should not work together.[4] *Id.* at 108:11-15.

Additionally, Joe Glenn, a union steward, would critique Plaintiff's time sheet and make comments about her incompetence. Plaintiff informed her supervisors and the Ethics Department about this, by filing an internal complaint on May 2, 2014. *See* Dkt. No. 31-4 at 26:2-14; Dkt. No. 32 at ¶ 39; Dkt. No. 36 at 28-29. On one occasion, Plaintiff heard Mr. Glenn tell a large group of her colleagues that Plaintiff "had sat on someone in management's face in order to receive extra overtime." *See* Dkt. No. 31-4 at 60:7-13; Dkt. No. 32 at ¶ 39. Plaintiff reported this statement to Stevens, who broke up the conversation and reported it to Mr. Ackermann. *See* Dkt.

---

[4] Plaintiff's Affidavit states that Cordi was never disciplined for this incident or trained to correct his behavior. Dkt. No. 32 at ¶ 31. However, at her deposition, Plaintiff testified that she filed charges with the union against Cordi, which resulted in a meeting where Cordi apologized for his actions and Plaintiff was assured that she would not work with him again. *See* Dkt. No. 31-4 at 111:11-112:4; *see Moll*, 760 F.3d at 205 (discussing the "sham issue of fact" doctrine).

No. 31-4 at 60:7-18.

Finally, Plaintiff recounts a few other offensive comments by her coworkers. Plaintiff once heard Joe Hennessey, a foreman, make a reference to being "fuck Wilson trained." *Id.* at 76:17-78:18. Additionally, after Plaintiff was promoted to Chief Gas Mechanic in 2014, she claims that Bill Peck told her that "they might as well just let a dog do it." *See* Dkt. No. 32 at ¶ 33. Lastly, she recounts a time when an assistant steward named William Warner told her "[i]t was nice to see Sandra, the bitch, put away" and "it's nice to see the nice Sandra and not the bitch Sandra." *See* Dkt. No. 31-4 at 72:22-74:12.

Mr. Stevens reported his concerns about the mistreatment of Plaintiff to Mr. Ackermann and Mr. Krogh several times, and claims to have informed them that he thought "this unfair treatment was due to her status as an African-American woman." *See* Dkt. No. 33 at ¶¶ 19, 20.

### 3. Unequal Facilities

Plaintiff alleges disparity in the Schenectady facilities. The women's lockers are located on the second floor, which Plaintiff felt was dangerous because it required the women to carry wet equipment up the stairs to their lockers.[5] *See* Dkt. No. 32 at ¶ 18. The men's lockers, on the other hand, were located on the first floor in the break room. *Id.* at ¶ 17. After Plaintiff complained about this, the women's lockers were moved into an electrical room on the first floor, which violated Occupational Safety and Health Administration standards, and then subsequently moved to an open area in the garage. *Id.* at ¶¶ 19-22. Once, Plaintiff found that someone had rifled through her personal belongings and reported this invasion of privacy to the Ethics

---

[5] Ms. Piel stated that she and other female employees used the second floor locker room without any issues, and never felt unsafe doing so. *See* Dkt. No. 26-13 at ¶ 16.

Department.[6]  *Id.* at ¶ 23.

Additionally, women were not allowed to use the break room because it contained the men's lockers.  *See* Dkt. No. 32 at ¶ 17.  After Plaintiff objected to this, Defendants held meetings with the men and posted signs explaining that women could use the break room.  *See* Dkt. No. 31-4 at 117:12-18.  However, these signs were "ripped down and ignored."  *See* Dkt. No. 32 at ¶ 17.

### 4. *Meetings between Plaintiff and Defendants*

In January 2014, Plaintiff met with Mr. Ackermann, Mr. Stevens, Mr. White, and Mr. Krogh to report her workplace troubles.  *See* Dkt. No. 30 at 12.  At this meeting, Mr. Stevens attested that he personally witnessed the misconduct and Plaintiff stated that she believed she was being mistreated because she is an African American woman.  *See* Dkt. No. 33 at ¶ 22.  According to Plaintiff, Defendants assured her that there would be improvements, but "no extra programs and training occurred, and the environment . . . did not change."  *See* Dkt. No. 32 at ¶ 45.

Plaintiff received two disciplinary letters from Defendants that month: one for being three hours late to a job site on January 15, 2014, and the second for not showing up to work without informing her supervisors on January 20, 2014.  *See* Dkt. No. 32-1 at 10-11.

Some time after the January meeting, Plaintiff and Mr. Stevens believe that Mr. Cordi intentionally caused a gas leak at a job on 12th Street to sabotage Plaintiff.  *See* Dkt. No. 30 at 12.  On March 21, 2014, Mr. Stevens met with Mr. Krogh and Sean Donahue, another gas operations supervisor, to inform them about issues that Plaintiff was having with Mr. White and his

---

[6] Plaintiff's Affidavit alleges that Defendants counseled Plaintiff for being "too emotional" instead of disciplining those responsible.  *See* Dkt. No. 1 at ¶ 39.  At her deposition, Plaintiff testified that she did not recall anyone ever telling her that she was too emotional, but that after this incident Mr. Stevens did try to get her to stop crying.  *See* Dkt. No. 31-4 at 55:10-24.

suspicions about Mr. Cordi causing the leak. *Id.* at 12-13. Three days later, Mr. Stevens met with Mr. Buck, Mr. Krogh, and Mr. Ackermann to discuss his concerns. *See* Dkt. No. 33 at ¶ 28. This time, Mr. Stevens reported that he believed that Mr. White and Bryan Frasier, a supervisor from another location, had an agenda to "go after" Plaintiff.[7] *Id.* at ¶ 29; Dkt. No. 31-1 at 46:17-18. In light of this meeting, Defendants decided not to transfer Mr. Frasier to Schenectady and Mr. Krogh was directed to spend more time working directly with Mr. White and the employees at the Schenectady barn. *See* Dkt. No. 26-1 at ¶ 23.

On April 1, 2014, Plaintiff filed a complaint of discrimination and harassment with the NYSDHR. *See* Dkt. No. 32-1 at 2-3. That same day, Plaintiff met with Mr. Ackermann, Mr. Krogh, and a union representative. *See* Dkt. No. 32 at 49. At this meeting, they discussed Plaintiff's concerns about how she as being treated by coworkers, Plaintiff's emotional well-being, the leak at 12th Street, and Defendants' prior promises to help. *See* Dkt. No. 30 at 13. Defendants promised to work on programs and training to correct the work environment in Schenectady. *Id.* In light of this meeting, Plaintiff withdrew her NYSDHR complaint. *Id.* at 14.

After this, Plaintiff did not raise any other concerns to her supervisors. *See* Dkt. No. 26-1 at ¶ 27; Dkt. No. 26-13 at ¶ 12.

### 5. *January 22, 2015 Safety Incident*

The United States Department of Labor mandates that drivers conduct various pre-trip inspections ("Title 49 inspections") before moving their vehicles onto public highways. *See* Dkt. No. 26-1 at ¶ 12. In April 2013, Defendants implemented a Safe Motor Vehicle Operations Policy (the "Policy") which requires drivers to perform these Title 49 inspections before operating

---

[7] The parties disagree as to whether Stevens indicated that this agenda was motivated by bias against Plaintiff's gender or race. *See* Dkt. No. 26-1 at ¶ 21; Dkt. No. 30 at 13.

a vehicle for the first time of the day and to conduct a "circle of safety" inspection by walking around the entire vehicle or piece of equipment each time they intend to move it. *Id.* at ¶ 13; Dkt. No. 26-5 at §§ 4.1.1, 4.1.2. The Policy provides that any employee who violates the Policy "shall be subject to disciplinary action, up to and including termination of employment and referral to appropriate authorities" and that the Company may "temporarily suspend driving privileges of Company vehicles and equipment while conducting the investigation of an incident." Dkt. No. 26-1 at ¶ 14; Dkt. No. 26-5 at §§ 10.1, 10.2.

On January 22, 2015, Plaintiff was involved in a safety-related incident in which she failed to properly inspect her vehicle before driving out of the garage. *See* Dkt. No. 32 at ¶ 58. After Plaintiff pulled a truck out of the garage, a coworker informed her that she "almost killed two people." *See* Dkt. No. 26-20 at ¶ 26. Thinking this was a joke or an attempt to get her into trouble, Plaintiff said she was not a "babysitter" and continued to the job site, without checking on her coworkers. *See id.*; Dkt. No. 32 at ¶ 61.

Defendants conducted a four-day investigation into the incident, during which they interviewed eight employees, including Plaintiff. *See* Dkt. No. 30 at 14; Dkt. No. 32-1 at 22. Plaintiff admitted that she did not perform a "circle of safety" inspection and did not return to the garage afterwards. *See* Dkt. No. 32-1 at 23. Defendants concluded that Plaintiff had violated the Company's Safe Operations Policy and neglected her duty as Chief Gas Mechanic by not checking on her crew after the incident. *Id.* On January 28, 2015, Defendants issued Plaintiff a three-day disciplinary suspension and demoted her from the Chief Gas Mechanic position for one year. *Id.* at 24. Plaintiff claims the demotion "resulted a substantial decrease in overtime, compensation, and earning capacity, as well as severe mental anguish and distress," for which she sought counseling. *See* Dkt. No. 32 at ¶ 66.

*6. Arbitration*

Plaintiff appealed the discipline through the labor contract grievance arbitration process on February 27, 2015. *See* Dkt. No. 32-1 at 17. After a full hearing, the arbitrator issued a thirty-six page opinion and award. *See id.* at 15-50.

At arbitration, Defendants pointed to violations of three provisions of the Company Safety Policy to support the disciplinary action against Plaintiff: (1) that she did not conduct a Title 49 pre-trip inspection as required by federal law and Defendants' Safe Operations Policy, (2) that she did not prepare a pre-trip inspect report as required by federal law and the Safe Operations Policy, and (3) that she did not conduct a "circle of safety" inspection as required by the Safe Operations Policy. *Id.* at 26. The arbitrator concluded that Plaintiff's failure to prepare a pre-trip inspection report did not justify disciplinary action because employees typically forgot to do so but were not disciplined. *Id.* at 44. Additionally, the arbitrator found two minor flaws with the investigation. *Id.* at 44-45. Notwithstanding these issues, the arbitrator concluded that Plaintiff's failure to conduct a "circle of safety" before driving the vehicle out of the garage and decision not to return to the garage to check on her coworkers was unacceptable. *Id.* at 45-46. Because of this misconduct, the arbitrator concluded that Defendants had "just cause" for their decision to suspend and temporarily demote Plaintiff. *Id.* at 45-47.

The arbitrator explicitly rejected the union's assertion that Plaintiff was the victim of disparate treatment. *Id.* at 47. In support of this argument, the union provided evidence of a safety incident from 2010 in which the employee received a lesser punishment than Plaintiff. *Id.* The arbitrator found that Plaintiff's "excuses for ignoring a possible safety issue distinguishe[d] her situation from the 2010 episode." *Id.* As such, the arbitrator concluded that Defendants had proper basis to discipline and demote Plaintiff. *Id.*

As for the demotion, the arbitrator agreed with Defendants that Plaintiff's conduct demonstrated a lack of good judgment and leadership skills. *Id.* at 48 (finding the decision to leave the site without checking on her coworkers "inexcusable" for any employee, but particularly troubling for a designated leader such as Plaintiff). The arbitrator continued:

> An employer has an absolute right, indeed a duty, to evaluate questionable conduct by employees in supervisory or quasi-supervisory roles. The Company also properly considered [Plaintiff's] threatening outburst of some two months earlier when she reacted to learning that someone had tampered with her personal backpack. Although Ms. Wilson was justifiably angry when learning her personal property had been tampered with, her subsequent threat to 'shank someone' or 'jack someone up' would be unacceptable for any employee but particularly egregious coming from someone with leadership responsibilities.

*Id.* Considering the totality of this conduct, the arbitrator concluded that Defendants acted appropriately by temporarily removing Plaintiff from the Chief Gas Mechanic position. *Id.* However, the arbitrator found that the one-year demotion was excessive because it imposed a significant financial cost on Plaintiff, so he reduced the demotion to four months. *Id.* at 49-50.

### 7. The "Sniffer" Role

On May 12, 2015, Plaintiff was "written up" for not communicating with her coworkers and for standing unengaged in a corner during briefings. *See* Dkt. No. 30 at 16. Defendants had a meeting with Plaintiff to discuss these issues. *See* Dkt. No. 32-1 at 53. After the meeting, Plaintiff was temporarily reassigned to conduct leak survey tasks without a crew, which was known as the "sniffer" job. Dkt. No. 26-1 at ¶¶ 51-52. Plaintiff claims that sniffer is a less prestigious role with less opportunities for overtime. *See* Dkt. No. 30 at 3.

## B.     Procedural History

On March 23, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC"), which she amended in August 2015. *See* Dkt. No. 26-16

at ¶ 2; Dkt. No. 31-4 at 33:8-12, 34:5-9.  The EEOC investigated, and on September 14, 2016

issued a Dismissal and Notice of Rights which stated that it was "unable to conclude that the

information obtained establishes violations of the statutes" and provided Plaintiff a right to sue.

*See* Dkt. No. 26-17 at 2.

On December 13, 2016, Plaintiff filed a Complaint against Defendants, alleging unlawful

discrimination and retaliation.  *See* Dkt. No. 1 at ¶ 5.  On April 2, 2018, Defendants filed a

Motion for Summary Judgment.  *See* Dkt. No. 26.  Plaintiff filed her Opposition on May 25,

2018, and on June 8, 2018, Defendants filed their Reply.  *See* Dkt. Nos. 29, 36.  For the following

reasons, the Motion for Summary Judgment is granted.

### III. DISCUSSION

**A.      Legal Standard**

A court may grant a motion for summary judgment only if it determines that there is no

genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the

court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at

36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a

motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex

Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the

court is required to resolve all ambiguities and draw all reasonable inferences in favor of the

nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986)) (other citations omitted).

**B.      Discrimination under Title VII and NYSHRL**

Defendants argue that Plaintiff was disciplined for legitimate, non-discriminatory reasons and that Plaintiff cannot establish a *prima facie* case of discrimination or demonstrate that the reasons stated for their employment actions are a pretext for discrimination. *See* Dkt. No. 26-21 at 13. In response, Plaintiff asserts that she has established an inference of discriminatory intent by showing that she was subjected to a hostile work environment and disparate treatment. *See* Dkt. No. 29 at 21.

To establish a *prima facie* case of discrimination under Title VII and the NYSHRL, "a plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action that give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp.*, 652 Fed. Appx. 54, 56 (2d Cir. 2016) (citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester*, 869 F.2d 100, 106-07 (2d Cir. 1989)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 316 (2004) (holding that the *McDonnell Douglas* framework applies to discriminatory discharge claims brought pursuant to the NYSHRL) (citations omitted).

Discrimination claims are evaluated pursuant to the burden-shifting analysis articulated in *McDonnell Douglas*, 411 U.S. at 802-03.

> Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. 411 U.S. at 802, 93 S. Ct. 1817. If the plaintiff does so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action. *Id.* Once such a reason is provided, the plaintiff can no longer rely on the *prima facie* case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination.

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).  To rebut the articulated justification for the adverse action, "the plaintiff must show *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 n.4 (1993) (internal quotations omitted).  However, conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment.  *See Diggs v. Niagara Mohawk Power Corp.*, No. 1:14-cv-244, 2016 WL 1465402, *6 (N.D.N.Y. Apr. 14, 2016) (citing *Holcomb*, 521 F.3d at 137); *see also Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

With respect to Plaintiff's *prima facie* case, it is undisputed that, as an African American woman, Plaintiff is a member of a protected class under Title VII, and she satisfactorily performed her job up until the January 2015 incident.  *See* 42 U.S.C. § 2000e-2(a); Dkt. No. 26-20 at ¶¶ 4, 11, 12.  Therefore, in order to establish a *prima facie* case of discrimination, Plaintiff must show that (1) she suffered an adverse employment action and (2) the circumstances surrounding this action give rise to an inference of discrimination.

### 1. *Adverse Employment Action*

An adverse employment action includes any "materially adverse change in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (quotation omitted).  "To be 'materially adverse' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quotation omitted).  "A change that is 'materially adverse' could consist of, *inter alia*, 'a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular

situation." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) (quoting *Galabya*, 202 F.3d at 640).

After the January 2015 incident, Plaintiff was (1) suspended and demoted, (2) "written up" in May 2015, and (3) assigned to the job of "sniffer." *See* Dkt. No. 32 at ¶¶ 63, 67. In the Opposition, Plaintiff acknowledges that the only actionable adverse employment decision is the suspension and demotion. *See* Dkt. No. 29 at 27 n.9. The Court agrees that the three-day suspension and one-year demotion, at least temporarily, materially changed Plaintiff's title, salary, and responsibilities. The other complained of actions are mere inconveniences or alterations of Plaintiff's job responsibilities, and are not adverse employment actions. *See Galabya*, 202 F.3d at 640. The record shows that "sniffer" is a part of Gas Mechanic C's responsibilities. *See* Dkt. No. 31-4 at 40:8-41:2 (acknowledging that sniffer is not a job title); Dkt. No. 31-4 at 82:12-18 (admitting that Plaintiff's job classification as a Gas Mechanic C and pay did not change when she became a sniffer). Likewise, being "written up" did not materially change Plaintiff's working conditions. Thus, the only actionable adverse employment action was Plaintiff's suspension and demotion.

### 2. *Inference of Discrimination*

A plaintiff may create an inference of discrimination by showing disparate treatment, *i.e.*, by showing that his employer "treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000). To do so, the plaintiff must show that he was "'similarly situated in all material respects'" to the individuals with whom he seeks to compare himself. *Id*. (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997)).

### a. The Collins Defense

Defendants argue that Plaintiff cannot establish a *prima facie* case of discrimination because she has not shown that the arbitrator's decision regarding her termination was wrong as a matter of fact, or that the impartiality of the arbitration proceeding was somehow compromised. Dkt. No. 26-21 at 16. Defendants rely on the Second Circuit decision *Collins v. N.Y. City Transit Auth,* 305 F.3d 113, 119 (2d Cir. 2002) to make this argument.

In *Collins,* the Second Circuit reviewed a discrimination case after an arbitrator upheld the employee's termination. The Second Circuit affirmed the district court's decision to grant the employer's motion for summary judgment and stated that while the appellant proffered enough evidence to create an issue of fact as to whether his termination resulted from discriminatory or retaliatory purposes, "that proffer was not sufficient to overcome the additional probative weight of the arbitration award allowing his termination." *Id*. The court concluded that a negative arbitration decision does not preclude a Title VII action by a discharged employee. *Id*. (other citations omitted). However, if an independent arbitrator's decision "follows an evidentiary hearing and is based on substantial evidence," a Title VII plaintiff "must present strong evidence that the decision was wrong as a matter of fact" or that the "impartiality of the proceeding was somehow compromised" in order to survive a motion for summary judgment. *See id.*; *see also Attard v. City of N.Y.*, 451 Fed. Appx. 21, 24 (2d Cir. 2011).

*Collins* has consistently been followed and applied by the district courts in the Second Circuit. *See e.g., DiFillippo v. Special Metals Corp.*, No. 6:13-cv-215, 2016 U.S. Dist. LEXIS 119771, *14-19 (N.D.N.Y. Sept. 6, 2016) (finding just cause for the demotion and termination of an employee who had continuously, knowingly violated company rules); *see also Diggs*, 2016 WL 1465402 at *6 (finding just cause for the termination of an employee who violated company

policy by using company tools for unauthorized personal use). In both *DeFillippo* and *Diggs*, the court relied on *Collins* to grant summary judgment because the plaintiffs did not show that the arbitrator's decision was wrong as a matter of fact, or that the impartiality of the arbitration proceeding was somehow compromised. *Diggs*, 2016 WL 1465402 at *6; *DiFillippo*, 2016 U.S. Dist. LEXIS 119771 at *18-19.

Applying *Collins* here, the arbitrator's award is entitled to additional probative weight. Nothing in the record suggests that the impartiality of the arbitration was somehow compromised, or that the decision was wrong as a matter of fact. In fact, both Plaintiff and Defendants agree that the arbitrator's decision should be given "great weight," although each disagrees about what the arbitrator actually concluded. *See* Dkt. No. 29 at 22-23; Dkt. No. 26-21 at 16. As such, the Court has independently reviewed the arbitrator's decision.

### b. *Disparate Treatment*

Plaintiff argues that the arbitrator found that, although Plaintiff had violated a safety procedure, the "discipline imposed for failing to complete the circle of safety was inappropriate and excessive." *See* Dkt. No. 29 at 23. Further, Plaintiff claims the arbitrator held that Defendants inappropriately disciplined her for failing to complete a Driver's Inspection Report. *Id.* In Plaintiff's opinion, these conclusions are evidence of disparate treatment. *Id.*

The Court disagrees. The arbitrator explicitly rejected the union's assertion that Plaintiff was the victim of disparate treatment when he found that Plaintiff's "excuses for ignoring a possible safety issue distinguishe[d] her situation" from a different safety incident in which the employee was not punished as severely as Plaintiff. *See* Dkt. No. 32-1 at 47. Plaintiff contends that the arbitrator dismissed the disparate treatment claim only with respect to whether Plaintiff deserved *any* discipline, and actually held that Plaintiff was subject to disparate treatment when

17

he reduced the length of the demotion. *See* Dkt. No. 29 at 23 n.5. The arbitrator did not reach this conclusion. *See* Dkt. No. 32-1 at 47-50. Rather, the arbitrator concluded that Defendants had proper basis to discipline and demote Plaintiff, but modified the disciplinary action because a shorter demotion "would have limited the damages suffered by [Plaintiff] while still permitting [Defendants] to exercise [their] right to protect the health and safety of [their] employees." *Id.* at 49.

Regardless, there is no evidence of disparate treatment in the record. Plaintiff submitted an affidavit from Gary Stevens (the "Stevens Affidavit"), in which he provides many examples of what he believes are evidence of disparate treatment of other employees. *See* Dkt. No. 33 at ¶ 37 (comparing an African American employee who was terminated for unauthorized use of company equipment with a Caucasian man who was not terminated for committing the same offense); *see also* Dkt. No. 33 at ¶¶ 38-40. These examples do not prove disparate treatment in this case, and none of those employees are similarly situated to Plaintiff here.

Additionally, Plaintiff relies on an incident from December 2010 involving a Caucasian male employee named Gregory Welsh. *See* Dkt. No. 33 at ¶ 33. Plaintiff argues that Mr. Welsh's case proves disparate treatment because Mr. Welsh held the same position as Plaintiff and failed to perform a "circle of safety" inspection. *See* Dkt. No. 29 at 23-24. Mr. Welsh struck and injured a fellow crew member but, unlike Plaintiff, was "not suspended, demoted, given a written reprimand, or subjected to discipline of any kind." *Id.* at 24. The arbitrator reviewed this incident and determined that Plaintiff was not similarly situated to Mr. Welsh for the following reasons: (1) the incident with Mr. Welsh occurred two and a half years before the Safe Operations Policy was implemented, (2) unlike Plaintiff, Welsh was unaware that a "circle of safety" inspection was required because it was not yet part of an established, written policy, and (3) safety documents in

place at the time of Mr. Welsh's accident did not warn employees that they would be disciplined for failing to perform a "circle of safety" inspection. *See* Dkt. No. 32-1 at 31-33; *see also* Dkt. No. 26-12 at 2, 15, 17-21. The arbitrator also noted that immediately following the incident, Plaintiff demonstrated a lack of the leadership skills, temperament, and judgment demanded of a Chief Gas Mechanic. *See* Dkt. No. 32-1 at 27. The Court agrees that these differences are significant, and finds that Plaintiff was not similarly situated to Gregory Welsh.

Since the record does not show that Defendants "treated [her] less favorably than a similarly situated employee outside [her] protected group," Plaintiff has not met her burden of showing that she was a victim of disparate treatment. *See Graham*, 230 F.3d at 39.

## C.    Title VII Hostile Work Environment

"To state a hostile work environment claim in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) 'is objectively severe or pervasive, that is, . . . the conduct creates an environment that a reasonable person would find hostile or abusive'; (2) creates an environment 'that the plaintiff subjectively perceives as hostile or abusive'; and (3) 'creates such an environment because of the plaintiff's [race],'" *Patane*, 508 F.3d at 113 (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)), or because of any other characteristic protected by Title VII, s*ee Gregory*, 243 F.3d at 692 (indicating that any characteristic protected by Title VII is sufficient to satisfy the third element).

"In determining whether conduct constitutes a hostile work environment, the Court must consider the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating, and whether the conduct unreasonably interferes with the plaintiff's work performance." *Salmon v. Pliant*, 965 F. Supp. 2d 302, 305 (W.D.N.Y. 2013) (citations omitted). "[A] few isolated incidents of 'boorish or offensive use of language' are

generally insufficient to establish a hostile work environment." *Id.* (citations omitted). The court must review the totality of the circumstances, and may consider incidents that are facially neutral, "so long as a reasonable fact-finder could conclude that they were, in fact, based on sex [or race]." *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) (collecting cases). However, the Court must exclude from its consideration "personnel decisions that lack a linkage or correlation to the claimed ground of discrimination" because "[e]veryone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude." *Id.*; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000) (holding that objectionable but facially sex-neutral behavior by one person could not be considered in a hostile work environment claim where there was no evidence of that person's bias).

### 1. Race-Based Hostile Work Environment

During her deposition, Plaintiff admitted that, in her twenty-eight years of employment with Defendants, she has never personally heard anyone use racially derogatory or racially offensive comments towards her or any other person. *See* Dkt. No. 31-4 at 64:12-66:6, 112:15-113:14. Further, aside from Plaintiff's conclusory allegations, she was unable to recall more than a handful of offensive comments and conduct, nearly all of which either occurred outside of the relevant statute of limitations or are based on inadmissible hearsay.

For example, Plaintiff alleges that "Mr. White said that it was his goal to 'get rid . . . . [of] all the niggers in Schenectady.'" *See* Dkt. No. 29 at 7. Plaintiff's Affidavit makes clear, however, that she learned of the alleged statement from Mr. Stevens and Mr. Stevens indicated that he learned of the statement from Ken LeFerve. *See* Dkt. No. 32 at ¶ 28; Dkt. No. 33 at ¶ 10. The record does not contain an affidavit from Mr. LeFerve.

Similarly, Plaintiff alleges that "[w]hen two African-American employees wore white suits to work, Mr. White stated 'this is the closest [they] will be to being white.'" *See* Dkt. No. 29 at 7. Again, however, neither affiant has first-hand knowledge of the statement. Plaintiff learned of the statement from Mr. Stevens, who learned it from James Brown and Lemonte Johnson. *See* Dkt. No. 32 at ¶ 29; Dkt. No. 33 at ¶ 11.

Plaintiff further alleged that Mr. Cordi told her that "'no one wanted her'" in the Schenectady barn and that she should "'go back where [she] came from,'" allegedly referring to Africa.[8] *See* Dkt. No. 29 at 8. As with most of her allegations, Plaintiff failed to provide even an approximate date that this event allegedly occurred. Plaintiff's notes, however, make clear that the incident occurred in April of 2012, which is clearly beyond the 300-day statute of limitations applicable to Title VII claims. *See* Dkt. No. 36-1 at 4.

Plaintiff also alleges that, when she was a Gas Mechanic C, coworkers had passed around cartoon drawings depicting African-American women in stereotypical ways. *See* Dkt. No. 32 at ¶¶ 15-16. During her deposition, Plaintiff admitted that she had never seen the "Aunt Jemima" cartoon but she did see one cartoon depicting her with "large lips, large breasts, and a large derriere." *See* Dkt. No. 31-4 at 103:5-105:16. Plaintiff admitted that the incident involving the "Aunt Jemima" cartoon occurred prior to January 2014. *See id.* Further, Plaintiff testified that the incident involving the other drawing occurred "during the time that Mr. O'Keefe was there." *See id.* at 105:6-11. Mr. O'Keefe, however, retired from the Company on April 30, 2011. *See*

---

[8] As Defendants correctly note, this statement is ambiguous at best. When read in context, it appears more likely that Mr. Cordi was telling Plaintiff to go back to the department she came from, not back to Africa. *See* Dkt. No. 36-1 at 4 (referring to Mr. Cordi's "kick me out of gas, Comment").

Dkt. No. 36 at ¶ 4. As such, these alleged incidents also occurred beyond the applicable statute of limitations.

As to the incidents involving moving the women's lockers to an unsafe location and rummaging through Plaintiff's belongings, the record shows that they occurred at some point in 2000. *See* Dkt. No. 31-4 at 42:7-45:15. Further, Plaintiff's allegation that Mr. Cianfarani yelled at her and prohibited her, and her alone, from driving the crew truck occurred sometime in 2012 or 2013. *See id.* at 22:21-24:24. Finally, Plaintiff alleged that "[s]everal years ago, Ms. Wilson was late to work" and "her supervisor disciplined her by requiring her to walk through the garage, and raise her hand to report that she had arrived on time." *See* Dkt. No. 32 at ¶ 14. Again, the record makes clear that this incident occurred in 2012 and is beyond the applicable statute of limitations. *See* Dkt. No. 31-3 at 45:5-22.

As such, the Court finds that the only properly supported allegations relating to Plaintiff's race-based hostile work environment claim fall outside of the relevant statute of limitations; and, therefore, Defendants' motion for summary judgment is granted as to this claim. *See Russo v. New York Presbyterian Hosp.*, 972 F. Supp. 2d 429, 449 (E.D.N.Y. 2013) (granting summary judgment on the plaintiff's hostile work environment claim because she failed to present any evidence that she was subject to any discrimination based on her protected status within the statute of limitations time frame) (citations omitted).

Moreover, even assuming that Plaintiff had identified an incident supported by admissible evidence that occurred within the relevant time frame, the Court finds that the misconduct was not "'severe or pervasive enough to create an objectively hostile or abusive work environment.'" *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) (quotation omitted). Contrary to Plaintiff's conclusory allegations, the record demonstrates only isolated incidents involving racially charged

misconduct, that occurred over a period of many years, and almost always outside of Plaintiff's presence. The cartoon depicting racial stereotypes was an isolated incident, the circumstances surrounding the locker incident do not suggest it was motivated by discriminatory intent, and no one in the record has first hand knowledge of Mr. White's alleged comments. As such, even assuming that Plaintiff's race-based hostile work environment claim was not untimely, the undisputed evidence identifies only sporadic hostility that is otherwise insufficient to support her Title VII claim. Accordingly, Plaintiff has not proven that she was subjected to a hostile work environment because of her race.

### 2. Gender-Based Hostile Work Environment

In support of her gender-based hostile work environment claim, Plaintiff alleges that, after reviewing her time sheets, Joe Glenn said that Plaintiff must have "'sat on someone's face' in management in exchange for extra overtime." *See* Dkt. No. 29 at 7; Dkt. No. 32 at ¶ 39. In her complaint to human resources, Plaintiff indicated that the incident occurred on May 2, 2014, which is outside the relevant statute of limitations. *See* Dkt. No. 36 at ¶¶ 10-12. Significantly, Plaintiff made no mention of any inappropriate comments in her complaint or in a subsequent meeting with human resources. *See id.* at ¶ 12. Rather, her complaint was based solely on the fact that she believed that it was inappropriate for Mr. Glenn to review her time sheets. *See id.*

Plaintiff also claims that she "was constantly called 'bitch' and people dismissed her concerns by saying she was simply 'bitching.'" *See* Dkt. No. 29 at 8-9; Dkt. No. 32 at ¶¶ 34-35, 37. During her deposition, Plaintiff could recall only one specific incident of this when, during the summer of 2017 her coworker, William Warner, told her that she should not take everything to heart and that "'[i]t's nice to see the nice Sandra and not the bitch Sandra.'" *See* Dkt. No. 31-4 at 72:5-76:16. Again, although Plaintiff alleges that others constantly called her "bitch" or

accused her of "bitching," she is unable to identify any other individuals who made such comments, or any specific instances during the relevant time period when this occurred. *See id.*

Plaintiff next alleges that "people" told her that she was taking food off the plates of other men in the department and that Bill Peck told her that "since they allowed [her] to be Chief Gas Mechanic A, they might as well let a dog do it." Dkt. No. 29 at 8. Again, aside from the comment by Bill Peck, Plaintiff fails to identify who made these comments or when they occurred. Again, however, the record makes clear that they occurred at the time of her promotion in January 2014, outside of the relevant statute of limitations. *Id.*

As to the allegations that could possibly have occurred within the requisite time period, Plaintiff has failed to present any evidence suggesting that she was subject to hostility because of her gender. Rather, Plaintiff's own allegations make clear that the alleged hostile interactions were related to Plaintiff's relationship with her coworkers and, in some instances, the perception that Plaintiff was lazy and/or incompetent. For example, Plaintiff alleges that Mr. White "surrounded himself with almost all of the other mechanics on duty at the time, and told them all that I was incompetent, stupid, that I did not know how to do my job, and to ignore my instructions." *See* Dkt. No. 32 at ¶ 38. Nothing in this allegation suggests that the hostility was because of Plaintiff's gender.

Even assuming Plaintiff had identified an incident supported by admissible evidence that occurred within the relevant time frame, the Court finds that the alleged conduct was not sufficiently severe or pervasive to create an objectively hostile or abusive work environment. Rather, contrary to Plaintiff's unsupported allegations, the record demonstrates that the complained of incidents occurred over a period of many years, with the incidents separated by a

considerable amount of time.  While Plaintiff may have found these incidents offensive, they are patently insufficient to support a gender-based hostile work environment claim.

A comparison to hostile work environment cases that have survived summary judgment motions supports this conclusion.  *See e.g., Petrosino v. Bell Atl.*, 385 F.3d 210, 214 (2d Cir. 2004) (denying summary judgment on a hostile work environment claim where the record showed persistent sexually offensive remarks and graffiti, at least one drawing depicting the plaintiff performing a sex act on a supervisor, the plaintiff was groped and kissed, and coworkers made comments about the plaintiff's "ass," "tits,"  menstrual cycle, weight, and eating habits); *Redd v. New York Div. of Parole*, 678 F.3d 166, 169 (2d Cir. 2012) (finding summary judgment inappropriate where the plaintiff's supervisor made sexual advances at her by touching her breasts on three occasions).

As such, even assuming that some of these incidents were timely, Defendants are still entitled to summary judgment because the alleged hostility was not based on Plaintiff's gender.

**D.      Retaliation Claims**

Finally, Plaintiff alleges that Defendants retaliated against her for filing a complaint with the NYSDHR.  Courts analyze claims of Title VII retaliation according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) (citation omitted).  To make out a *prima facie* case of retaliation under Title VII, a plaintiff must establish the following: "'(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer.'"  *Gordon v. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (quotation omitted).

"Protected activity" includes any "action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).

Here, Plaintiff has established the first three prongs of a retaliation claim: Plaintiff filed a complaint with the NYSDHR, Defendants were aware of the complaint, and Plaintiff suffered an adverse employment action when she was demoted and suspended. *See* Dkt. No. 29 at 27 n.9. However, Plaintiff's claim fails on the causation element.

Proof of causation can be shown either indirectly through circumstantial evidence, or "directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon*, 232 F.3d at 117. Nothing in the record suggests that Defendants were motivated by retaliatory animus. In order to show a retaliatory motive by means of circumstantial evidence, there must be temporal proximity between the adverse employment action and the protected activity. *See Muhammad v. Juicy Couture/Liz Clairborne, Inc.*, No. 09-cv-8978, 2010 WL 4032735, *6 (S.D.N.Y. July 30, 2010). Plaintiff filed her complaint with NYSDHR and Defendants became aware of that complaint in early April 2014. *See* Dkt. No. 30 at ¶¶ 24-26. No adverse action was taken against Plaintiff until January 28, 2015, when she was disciplined for the January 22, 2015 safety incident. *Id.* at ¶ 34. Almost eleven months elapsed between when Plaintiff filed the NYSDHR complaint and when Plaintiff was suspended and demoted. Without temporal proximity to the adverse action, there is nothing to suggest that Defendants had a retaliatory motive.

Moreover, Defendants have articulated a legitimate, non-discriminatory reason for their actions and Plaintiff has not met her burden of showing that this explanation is pretext. *See Holt v. KMI-Cont'l*, 95 F.3d 123, 130 (2d Cir. 1996). The arbitrator concluded that Defendants had "just cause" for the disciplinary action. *See* Dkt. No. 32-1 at 45-47. The Court agrees that

Plaintiff's conduct surrounding the January 22, 2015 incident warranted the discipline that she received. As the arbitrator observed, the safety incident was particularly disturbing in light of Plaintiff's quasi-supervisory role, prior outbursts in that role when she threatened to "shank someone" or "jack someone up," and decision not to check on the employees after the incident. *See id.* at 48. Therefore, Defendants have proven a legitimate reason for the suspension and demotion, and are entitled to summary judgment as to Plaintiff's retaliation claim.

## IV. CONCLUSION

After careful review of the record, the parties' submissions, and the applicable law, the Court hereby,

**ORDERS** that Defendants' Motion for Summary Judgment is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor without further order of this Court and close this case; and the Court further

**ORDERS** that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 9, 2018
　　　Albany, New York

Mae A. D'Agostino
U.S. District Judge